William "Billy" MITCHELL, Petitioner,

v.

Joe S. HOPPER, Warden, Georgia State Prison, Respondent.

Willie X. ROSS, Petitioner,

v.

Joe S. HOPPER, Warden,[1] Georgia State Prison, Respondent.

James Lee SPENCER, Petitioner,

v.

Walter D. ZANT, Warden, Georgia Diagnostic & Classification Center, Respondent.

Civ. A. Nos. CV478–132, CV478–162 and CV179–247.

United States District Court, S. D. Georgia, Savannah and Augusta Division.

April 1, 1982.

1. Joseph S. Hopper was the warden at the Georgia State Prison where the petitioners were confined at the time these petitions were filed. Charles M. Montgomery is the present warden there. He would be automatically substituted as respondent under Fed.R.Civ.P. 25(d), except that the petitioners are now all confined at the Georgia Diagnostic and Classification Center in Jackson, Georgia, where Walter D. Zant is the warden. He will be considered a successor in interest for purposes of the petitions of William Mitchell and Willie Ross under Fed.R.Civ.P. 25(c), and is hereby substituted as respondent.

Bobby L. Hill, Savannah, Ga., for Mitchell.

C. B. King, Albany, Ga., for Ross.

Edward D. Tolley, Athens, Ga., for Spencer.

John C. Boger, New York City, for petitioners.

Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for Hopper.

William Hill, Asst. Atty. Gen., Atlanta, Ga., for Zant.

## MEMORANDUM AND OPINION

BOWEN, District Judge.

These three suits petition the Court for relief in the nature of habeas corpus. They were filed separately *in forma pauperis* under 28 U.S.C. § 2254. Each petitioner was convicted of murder and is now under sentence of death by electrocution; each petitioner challenges the constitutionality both of his conviction and of the sentence imposed. The three suits were not consolidated, but, because many issues raised were common to all three, they have been treated together at most phases of the litigation to conserve the time and resources of both the Court and of the parties. Consistent with this treatment, this memorandum will examine the three petitions in two stages; the common issues will be discussed together in one section, and the issues individual to each petition will be discussed separately in later sections.

I

### A. *Legal History*

William "Billy" Mitchell entered a guilty plea to the charge of murder on November 5, 1974, before a judge of the Superior Court of Worth County, Georgia. A presentence trial was held as required by Georgia law. Ga.Code Ann. §§ 27–2503, 27–2528, 27–2534.1.[2] After imposition of the

---

**2.** Ga.Code Ann. §§ 27–2503, 27–2528 and 27–2534.1 read as follows:

27–2503 *Presentence hearings in felony cases*

(a) Except in cases in which the death penalty may be imposed, upon the return of a verdict of "guilty" by the jury in any felony case, the judge shall dismiss the jury and shall conduct a presentence hearing at which the only issue shall be the determination of punishment to be imposed. In such hearing the judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas: Provided, however, that only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. The judge shall also hear argument by the defendant or his counsel and the prosecuting attorney, as provided by law, regarding the punishment to be imposed. The prosecuting attorney shall open and the defendant shall conclude the argument. In cases in which the death penalty may be imposed, the judge when sitting without a jury shall follow the additional procedure provided in section 27–2534.1. Upon the conclusion of the evidence and arguments the judge shall impose the sentence or shall recess the trial for the purpose of taking the sentence to be imposed under advisement. The judge shall fix a sentence within the limits prescribed by law. If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

(b) In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted in the same manner as presentence hearings conducted before the judge as provided in subsection (a) of this section. Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in section 27–2534.1, exist and whether to recommend mercy for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

27–2528 *Sentence to life imprisonment or lesser punishment by judge on plea of guilty to an offense punishable by death*

Any person who has been indicted for an offense punishable by death may enter a plea of guilty at any time after his indictment, and the judge of the superior court having jurisdiction may, in his discretion, during term time or vacation, sentence such person to life imprisonment, or to any punishment authorized by law for the offense named in the

sentence of death, the conviction was affirmed on direct appeal to the Georgia Supreme Court.[3] *Mitchell v. The State*, 234 Ga. 160, 214 S.E.2d 900 (1975) (Gunter, J.,

indictment: Provided, however, that the judge of the superior court must find one of the statutory aggravating circumstances provided in section 27–2534.1 before imposing the death penalty except in cases of treason or aircraft hijacking.

27–2534.1 *Mitigating and aggravating circumstances; death penalty*

(a) The death penalty may be imposed for the offenses of aircraft hijacking or treason, in any case.

(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27–2534.1(b) is so found, the death penalty shall not be imposed.

3. All three of the petitioners' direct appeals from convictions were considered by the Georgia Supreme Court in expedited appeals mandated by Ga.Code Ann. § 27–2537:

27–2537 *Review of death sentences*

(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Georgia. The clerk of the trial court, within 10 days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Georgia together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Georgia.

(b) The Supreme Court of Georgia shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence, the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstances as enumerated in section 27–2534.1(b), and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

dissenting without opinion), *cert. denied* 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976). Petitioner then filed a petition for the writ of habeas corpus in the Superior Court of Tattnall County, Georgia. A hearing was held in January, 1977, after which Judge Paul E. Caswell denied the petition by order of April 6, 1977. This denial was affirmed in *Mitchell v. Hopper*, 239 Ga. 781, 239 S.E.2d 2 (1977), *cert. denied*, 435 U.S. 937, 98 S.Ct. 1513, 55 L.Ed.2d 534 (1978).

Willie X. Ross was convicted of armed robbery, kidnapping and murder after a jury trial in the Superior Court of Colquitt County, Georgia, on March 3, 1974. Sentences of life imprisonment, twenty years and death were imposed on June 26, 1974. The conviction and sentence were affirmed by the Georgia Supreme Court in *Ross v. The State*, 233 Ga. 361, 211 S.E.2d 356 (1974) (Gunter, J., dissenting without opinion), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1217 (1976). After a hearing in the Superior Court of Tattnall County, the petitioner's suit for state habeas corpus relief was denied by Judge Paul E. Caswell on March 22, 1977. This decision was affirmed in *Ross v. Hopper*, 240 Ga.

369, 240 S.E.2d 850 (1977), *cert. denied*, 435 U.S. 1018, 98 S.Ct. 1890, 56 L.Ed.2d 397 (1978).

James Lee Spencer was convicted of murder, aggravated assault and escape after a jury trial in the Superior Court of Richmond County, Georgia, in January, 1975. Sentences of death for the murder and ten years running concurrently on the other two charges were imposed. The convictions and sentences were affirmed by the Georgia Supreme Court on appeal. *Spencer v. The State*, 236 Ga. 697, 224 S.E.2d 910 (1976) (Gunter J., dissenting without opinion), *cert. denied*, 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed.2d 302 (1976). An evidentiary hearing was held in the Superior Court of Tattnall County, Georgia, on Spencer's petition for state habeas corpus relief. This was denied by order of Judge James E. Findley on August 18, 1978. This denial was affirmed in *Spencer v. Hopper*, 243 Ga. 532, 255 S.E.2d 1 (1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979).

Three hearings have been held before this Court. On January 26, 1981, a hearing was held in Savannah, Georgia, pursuant to notice to counsel and in accordance with 28 U.S.C. § 2254(d)[4] to determine the necessi-

(d) Both the defendant and the State shall have the right to submit briefs within the time provided by the court, and to present oral argument to the Court.

(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(1) Affirm the sentence of death; or

(2) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel. The records of those similar cases referred to by the Supreme Court of Georgia in its decision, and the extracts prepared as hereinafter provided for, shall be provided to the resentencing judge for his consideration.

(f) There shall be an Assistant to the Supreme Court, who shall be an attorney appointed by the Chief Justice of Georgia and who shall serve at the pleasure of the court. The court shall accumulate the records of all capital felony cases in which sentence was imposed after January 1, 1970, or such earlier date as the court may deem appropriate. The Assistant shall provide the court with

whatever extracted information it desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

(g) The court shall be authorized to employ an appropriate staff and such methods to compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence.

(h) The office of the Assistant shall be attached to the office of the Clerk of the Supreme Court of Georgia for administrative purposes.

(i) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. The court shall render its decision on legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence.

4. 28 U.S.C. § 2254(d) provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determina-

ty for an evidentiary hearing. This first hearing was confined to the issues common to all three petitions. *See* Part II, below. The Court heard argument on the sufficiency of the record made in the courts of Georgia, the sufficiency of their findings of fact and allowed the petitioners to make offers of proof relating to evidence they would present at an evidentiary hearing. At the conclusion of this hearing, the Court announced its ruling as to the issues upon which evidence would be received, and the scope of the evidence permitted.[5] Evidence was taken at an evidentiary hearing the following day in accordance with this ruling.

The third hearing was held in Augusta, Georgia, to determine the necessity under 28 U.S.C. § 2254(d) for an evidentiary hearing on the individual issues raised in the three petitions. *See* Parts IIIA, IIIB and IIIC, below. Consistent with the procedure of the first hearing, the Court heard argument from counsel on the sufficiency of the record and the findings of fact made by the Georgia courts to determine the necessity for an additional evidentiary hearing. The

Court has concluded that no further hearings are mandated except as noted below.

### B. The Crimes

The Court here recites the facts surrounding the crimes of which the petitioners were accused and convicted. This section is not meant to add gloss to a proceeding which could be perceived as a dry, antiseptic legal exercise. To the contrary, an atmosphere of calm is crucial to the proper function of our system for dispensing justice. However, the following descriptions are included to provide necessary perspective about the business in which we are engaged.

■ The ancient writ of *habeas corpus ad subjiciendum* serves the modern and noble purpose of providing a remedy for those whose conviction or incarceration was obtained outside the bounds of the law. *Fay v. Noia*, 372 U.S. 391, 399, 83 S.Ct. 822, 827, 9 L.Ed.2d 837 (1963). The doctrine that no person may be illegally deprived of his liberty is a cornerstone of our legal system and of our society. However, during a proceeding to determine whether the

---

tion after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

5. This ruling was made from the bench and is set out in detail in Part II, below.

letter of the law has been followed in a criminal proceeding, the issue of the actual guilt or innocence of the defendant can be obscured by the examination of the legalities involved. This Court is not commenting here on the propriety of this obfuscation. Rather the Court deems it important and appropriate to remember that the source of our due process guarantees is the principle that no *innocent* person should ever be deprived of his liberty. The legalities examined by the courts in habeas proceedings were formulated to achieve this goal to the extent it is humanly possible.

The crimes for which these petitioners were convicted are not relevant to the existence *vel non* of constitutional infirmities in their trials and sentences. However, our criminal justice system works a delicate balance between the constitutionally protected liberty of the individual, and the interest of society as a whole in the efficient curtailment and punishment of crime. The following recitation [6] will emphasize the gravity of this balance here, for while the very lives of the petitioners are at stake, society has been grievously wronged as well by individual acts of premeditated and brutal violence.

*William "Billy" Mitchell*

On Sunday morning, August 11, 1974, at 7:00, Mrs. James Carr and her fourteen-year-old son Christopher opened I.G.A. Store Number 13, a convenience grocery store in Worth County, Georgia. About fifteen minutes later, while the two were preparing the store for the business day, Mitchell entered the store. He walked over to the soft drink cooler, then returned to the check-out counter near the door. There he confronted Mrs. Carr and Christopher, and demanded "all the money." This demand was repeated, and Mitchell produced a small pistol from his coat pocket, pointing it at Mrs. Carr from across the counter. She handed him about one hundred fifty dollars in bills from the cash register.

Mitchell then demanded and received the money Mrs. Carr and her son had in their personal possession.

Mitchell then ordered the two to go to the back of the store. They were marched into the storage area in the rear at gunpoint, walking through a meat room to a door leading to a cooler. Christopher was carried into the cooler by Mitchell. He stepped back out, saying to Mrs. Carr, "I've never had a white bitch before," and shoved her towards the adjoining bathroom. When Mrs. Carr cried out, "Oh my God, no!" the petitioner ordered her into the cooler, and pushed her inside with her son. Both got on the floor, Christopher sitting and his mother squatting.

Facing her son (with Mitchell behind her) Mrs. Carr heard a shot and saw a red hole appear on her son's chest. Then, she felt a jolt and a burning sensation in her head. Mrs. Carr testified that she heard the petitioner leave the cooler, then return in a few minutes. She had slumped to the floor, and saw only the legs of the assailant. Christopher, now lying on the floor of the cooler, was shot again in the back of the head, and Mrs. Carr was shot three more times in the arms and back. The petitioner left the cooler again. Mrs. Carr was able to get up and go to a telephone which was by the door of the cooler. She called the police and an ambulance.

In the front of the store, two boys had entered to find Mitchell behind the counter. They were ordered to the rear. Mitchell pointed his gun at one and pulled the trigger several times, but it did not fire, apparently out of ammunition. Mitchell took about six dollars from one of the boys and marched them into the cooler with Mrs. Carr and Christopher. He again attempted to shoot one of the boys, and the gun again did not fire. Leaving his four prisoners, Mitchell closed the door to the cooler and left the store. The police arrived shortly

---

6. The facts set out here are drawn largely from the opinions published by the Georgia Supreme Court in the direct appeal of each petitioner. They are fully supported by the evidence given at trial, and the accuracy of these particular findings is not challenged. They are therefore binding upon the Court under 28 U.S.C. § 2254(d). *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

thereafter, and Mitchell was taken into custody a few hours later. Christopher was dead.[7]

### Willie X. Ross

August 23, 1973, Willie X. Ross, Freddie Lee King, Rudy Turner and the petitioner's brother, Theodore Ross, planned to rob the Clover Farms Highway Grocery in Moultrie, Georgia. Pursuant to this plan, they drove to Moultrie from Madison, Florida, to stake out the store. When the store closed for the evening, the four followed the man who had closed the store to a nearby house in which J. R. Stanford and his family lived. They then returned to Madison.

The following evening, the four men returned to the Stanford home wearing stocking masks. Entering the house, they held the Stanford family at gunpoint while they ransacked their home. They collected money, jewelry and Mr. Stanford's .32 caliber pistol, then demanded the grocery store money. They were told that it was in the possession of Robert Lee, who lived nearby, and that Wendell Norman, Stanford's son-in-law and Lee's partner in the grocery store, would be returning to the Stanford home with his wife later that night. The four robbers waited, and when Norman and his wife arrived, Norman was overpowered and ordered to take Theodore Ross and King to the Lee house to get the money. Ross and King left with Norman and Stanford's fourteen-year-old stepdaughter, leaving the petitioner Ross and Turner with the Stanford family.

Theodore Ross, King, Norman and the girl arrived at the Lee residence, entered the home and proceeded to Lee's bedroom. Norman switched on the light, Lee awakened, and Norman informed him that Ross and King were there to get the money from the store. Lee reached for his pistol and began firing into the hallway at Ross and King. One of these two returned fire and grabbed one of the two small Lee boys present, threatening to kill the boy if Lee

did not stop firing and hand over the money. Lee complied, and Norman handed King the cash box, which contained approximately $20,000.00 in cash and checks. When Ross and King fled on foot, Norman telephoned the police to inform them of the robbery and that the Stanford family was being held at gunpoint at their home.

Moultrie Police Lieutenant Tommie Meredith gallantly responded to the call, arriving at the Stanford home within a few minutes, with Officer Frank Lynch close behind in a separate car. Meredith entered the kitchen door armed with a shotgun, and confronted Turner, who was armed with a pistol, crouching at the opposite end of the dining room table. Ross, armed with Stanford's pistol, was positioned in front of a refrigerator located in the dining room. Turner said to Meredith, "I've got them right here," indicating the Stanford family and motioning for one of them to come to him. As words were exchanged between Meredith and Turner, the Stanfords fled to a bedroom.

Both Stanford and Lynch testified that two shotgun rounds were fired, followed by a single pistol shot. The petitioner and Turner ran from the house and through the back yard, Lynch firing at them as they fled.

Lynch found Meredith's body on the kitchen floor, shot through the chest at point blank range. Turner's pistol was found fully loaded in the back yard, and the cartridge in the firing chamber bore an indentation indicating it had misfired. The .32 caliber pistol, which had been in Ross' possession, was found next to the back-yard fence, one round having been fired. It was determined that Meredith had been killed with this weapon.

Shortly after this incident, the appellant told his brother Theodore, who testified for the state, that he had shot a policeman and that Turner's gun had misfired. Petitioner also told another witness, Bobby Gamble,

---

**7.** At this point, the reader may wish to note that one of Mitchell's claims of ineffective assistance of counsel rests on the fact that his lawyer made no attempt to offer to the sentenc-

ing court evidence of his (Mitchell's) alleged activities in helping the youth of his hometown, Jacksonville, Florida.

that he believed he had killed a policeman. Petitioner was apprehended several months later and indicted for the kidnapping of Wendell Norman, the armed robbery of Robert Lee, and for the murder of Lieutenant Tommie Meredith.

*James Lee Spencer*

On October 31, 1974, Chief Deputy Sheriff L. O. Beazley of Richmond County was assigned to transport a prisoner, the petitioner, from the Richmond County Jail to the Georgia State Prison in Reidsville, Georgia. He picked up Spencer at the jail at 9:45 in the morning and placed him in the back seat of the transfer vehicle. A heavy wire mesh separated the front seat of the car from the back seat. Then Beazley picked up his father-in-law, Lett Williams, who was to accompany Beazley on the trip to Reidsville and back.

Beazley had left Augusta and was driving toward Millen, Georgia. The radio dispatcher reported, "Chief, the passenger you've got is supposed to have a gun." At that point, the petitioner shot Beazley three times. Beazley stopped the car and was shot in the head as he attempted to unlatch the door. This shot blinded him. Beazley managed to get the passenger door open, pushed his father-in-law out and crawled out himself.

Leslie Padgett was traveling on the Millen Highway about 10:15 when he saw a car stopped in the right lane. An elderly man stood at the rear of the automobile calling for help. As Padgett was getting his pistol, the old man, Mr. Williams, ran over to the car and put his head inside the window. One shot was fired by the petitioner. It hit Williams in the head from point blank range. Petitioner then kicked out a window of the rear compartment and climbed out of the car. Fortunately, he was apprehended by a state patrolman as he attempted to flee.

Mr. Williams died of the head wound he sustained. Deputy Beazley lives, but is permanently blind in his left eye.

There was evidence that Spencer had planned his escape several days in advance. Thomas Yancey, a former prisoner at the Richmond County Jail, testified that he and Spencer had discussed escaping. The day Spencer was to be transferred to Reidsville, Yancey saw him strap a pistol to his leg, then cover it with his sock. Yancey also testified that as Spencer passed him on the way out that morning, he said, "This here is the day." J. B. Dykes of the Richmond County Sheriff's Department testified that the petitioner had a homemade handcuff key concealed in his mouth on the day of the escape attempt. The key was recovered when the petitioner spit it into an officer's hand at an Augusta hospital.

## II. THE COMMON ISSUES

These three petitions each present seven issues which are substantially identical. All, of course, claim constitutional deprivations which depend on the facts unique to each case. However, the facts pertinent to each alleged violation do not vary substantively among the three petitions, and the legal analysis by which they must be examined is identical. Accordingly, these issues have been treated together by the Court, and will be examined together here for purposes of economy. The issues are:

(1) whether the death penalty is being imposed in an arbitrary and discriminatory matter in the State of Georgia;

(2) whether the death penalty is being imposed pursuant to a pattern and practice of discrimination based upon race, sex and poverty;

(3) whether the systematic exclusion for cause from the petitioners' juries, at the guilt phase of their trials, of prospective jurors with conscientious or religious scruples against the death penalty resulted in juries which were not comprised from a representative cross-section of the community and which were biased against petitioners in resolving questions of guilt or innocence [Spencer and Ross only];

(4) whether the appellate sentencing review procedures followed by the Supreme Court of Georgia suffice to

meet sixth and eighth amendment standards for review of capital cases;

(5) whether electrocution as a means of capital punishment is unnecessarily cruel and torturous;

(6) whether the failure by the state to give notice prior to trial of the aggravating circumstances necessary for imposition of the death penalty denied the petitioners' due process of law;

(7) whether the grand and petit juries placed upon the petitioners were unconstitutionally composed.

Extensive findings of fact were made in the courts of Georgia on all the issues in these three cases, and after extensive hearings; the combined records fill an entire drawer of a legal-size filing cabinet. It has been the consistent stance of the respondent that no further evidence need be taken in these cases, that the record is sufficient to compel a determination on all the issues where the facts, rather than legal precedent, are controlling. The petitioners, of course, maintain otherwise.

The Court heard argument from the parties in Savannah, Georgia, on January 26, 1981, on the applicability in these cases of the presumption of correctness created by 28 U.S.C. § 2254(d). *See* footnote 4, above. A review of the record and the various findings of fact made by the Georgia Supreme Court and the superior courts hearing the state post-conviction petitions reveals that these findings are, on their face, entitled to this presumption of correctness; the record is extensive, none of the proscriptions enumerated in section 2254(d)(1) through (7) appear to have been violated, and the findings are fairly supported by the evidence. In light of this preliminary appearance, the Court deemed it the responsibility of the petitioners to make an offer of proof which could override this presumption

before a full evidentiary hearing would be necessitated.

■ The petitioners argued that the hearings below were not full and fair hearings because they were not allowed to fully develop the pertinent facts. They contend that this occurred because the state denied motions made in all three cases for money to be allotted to the use of the indigent petitioners for the gathering and presentation of evidence on the first two issues enumerated above.

Two factors require this argument to fail. The first is that the record actually contains facts sufficient to uphold a determination on the issues, with the exceptions noted below. This is so especially in light of precedent which controls most of the issues. The United States Court of Appeals for the Fifth Circuit in *Spenkelink v. Wainwright*,[8] 578 F.2d 582 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), *rehearing denied*, 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979)[9] considered issues substantially identical to most of those raised here. As discussed below, the holding in that case severely limits the type of evidence which would be relevant here.

Secondly, the petitioners come prepared to present the same or similar evidence they claimed they could not present at the state level, and do this despite the denial of a similar request for money in this Court. Petitioners were represented at the state habeas corpus hearings by the same counsel who represent them here. While the issue need not be reviewed in detail in light of the conclusions mandated by the *Spenkelink* case, the Court will note that the fact of petitioner's ability to present evidence here when faced with the same purported lack of funds they faced during state proceedings casts the failure to present that evidence in the courts of Georgia in the light of strate-

---

8. The correct spelling of Spenkelink's name is with one "l", 578 F.2d 582, n.1. That spelling is used here.

9. Authority of the United States Court of Appeals for the Fifth Circuit decided prior to October 1, 1981, is binding precedent in this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

gic default.[10] It is the Court's determination that the refusal by the state of Georgia to provide funds for the use of the petitioners in their state suits did not affect the adequacy of their hearings.

### A. Arbitrary and discriminatory imposition of the death penalty

The petitioners allege that the death penalty in Georgia is being imposed in an arbitrary and discriminatory fashion. They assert that the Georgia death penalty statutes designed to eliminate capriciousness in the imposition of capital punishment do not, in fact, accomplish this goal. In support of this allegation, the petitioners offered evidence which they asserted would show that the death penalty is disproportionately imposed when considering factors such as the race of the defendant, the race of the victim and the locality of the crime. This evidence was offered in the form of statistical studies and proposed testimony of various social scientists to demonstrate discrimination as well as the ineffectiveness of the present statutes in correctly channeling the discretion of prosecutors, juries and judges.

The respondent rebuts on two levels. Construed as a selective prosecution claim, he asserts that the petitioners have not satisfied the two-prong test that (1) others similarly situated have not been prosecuted, or (2) that the government's prosecution of the petitioners is selectively invidious or based upon impermissible considerations such as race, religion or the exercise of some constitutional right. *See United States v. Hayes,* 589 F.2d 811, 819 (5th Cir. 1979), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). Second, the respondent asserts that the claim is disposed of by the *Spenkelink* decision.

The Court disagrees with the respondent's characterization of the petitioners' claim as one of selective prosecution. The allegation is broader than that, asserting not that the petitioners were individually singled out on the basis of race, sex or poverty, but rather that the statutory system employed by the Georgia courts to impose the death penalty does not control the discretion of prosecutors, judges and juries sufficiently to prevent the capricious and arbitrary imposition of this sanction disproportionately upon groups of which the petitioners are members. However, the Court agrees that the argument is controlled by judicial precedent.

Georgia's death penalty statutes were framed as they now exist in response to the United States Supreme Court's judgment in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Concern was expressed there that the penalty could be imposed by courts and juries in Georgia without significant guidance, and therefore capriciously and arbitrarily. *See Furman v. Georgia,* 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring). The present statutory scheme was designed to remove caprice from the system by affording guidance to the sentencing body, whether jury or judge. This system was given *prima facie* approval by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 198, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976).

Petitioners assert, as did the petitioner in *Gregg v. Georgia,* 428 U.S. at 198, 96 S.Ct. at 2936 that the new statutory scheme in Georgia only appears to have removed caprice from the system, that in fact the arbitrariness and discrimination condemned by *Furman* persist, and that the holding of *Gregg* creates only a rebuttable presumption that the revised statutes are constitutionally sound.

■ The Court disagrees with this interpretation of *Gregg.* In that case, the Supreme Court examined and rejected argu-

---

**10.** A strategy involving a failure to present evidence at a state hearing conceivably could be utilized to preserve the opportunity for a full hearing under section 2254(d) in the federal courts. No evidence to imply the petitioners have attempted this is before the Court, nor is a conclusion to this effect required. Such a strategy could, however, have a serious impact upon a petition in this Court, for this Court and the law would require its examination as a deliberate bypass of an available state remedy, which could work as a waiver of the issue. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

ments raised here by the petitioners. *Gregg* specifically holds that the residue of discretion in the imposition of the death penalty necessarily left to prosecutors, juries and judges is properly channeled by the statutes so as to eliminate caprice. 428 U.S. at 199, 96 S.Ct. at 2937. Further, the Court held that the automatic judicial supervision and fact-finding role assigned to the Georgia Supreme Court by Ga.Code Ann. § 27–2537 provides the mechanism by which the application of the aggravating circumstances by juries necessary for imposition of a death sentence may be supervised and checked. 428 U.S. at 200–206, 96 S.Ct. at 2937–40. *Gregg* holds, in short, that the caprice and arbitrariness proscribed in *Furman* have been conclusively removed from capital cases under the revised statutes, and that defendants properly tried and sentenced under that statute have been visited no constitutional violation. 428 U.S. at 206–207, 96 S.Ct. at 2940–41.

The United States Court of Appeals for the Fifth Circuit supports this interpretation in *Spenkelink v. Wainwright, supra.* Speaking of the *Gregg* decision and the other death penalty cases considered by the Supreme Court in the same term, the Fifth Circuit court opined:

> We understand these decisions to hold that capital punishment is not unconstitutional *per se*, and that a state, if it chooses, can punish murderers and seek to protect its citizenry by imposing the death penalty—so long as it does so through a statute with appropriate standards to guide discretion. If a state has such a properly drawn statute—and there can be no doubt that Florida has—which the state follows in determining which convicted defendants receive the death penalty and which receive life imprisonment, then the arbitrariness and capri-

ciousness condemned in *Furman* have been conclusively removed.

582 F.2d at 605.[11] There can be no doubt, similarly, that Georgia has such a properly drawn statute as well. *Smith v. Balkcom,* 660 F.2d 573, 584–86 (F. 5th Cir. 1981).

■ The petitioners' statistical evidence as proffered, and the evidence presented in the state courts of Georgia, do not override this finding. They would show that sentencing patterns under the new statute still reveal glaring disparities in the imposition of the death penalty based upon race, sex and poverty. This allegation may be true, and, if so, would be sad and distressing, but this allegation does not alone show any infirmity in a statute otherwise found to be acceptable under the Constitution. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Spenkelink, supra,* 612–616.

Of course, a petitioner may show specific acts of invidious discrimination which would invalidate a conviction and death sentence, *Spenkelink, supra,* 578 F.2d 614 n. 40, but the petitioners' proffered evidence does not show this, nor are any acts of individual discrimination alleged by any of the three petitioners.

Similarly, the petitioners could show that their convictions and sentences were imposed outside the limits set by Georgia law, that the statutes were not followed for some reason or that the courts were derelict in their duties. *See Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Again, no petitioner alleges this, nor does such appear to be the case from the record in these suits.

The Court must conclude that the first two issues have been effectively foreclosed to the petitioners by judicial decisions in

---

11. *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), is not to the contrary. In that case, the Supreme Court reversed the imposition of the death penalty in a Georgia court. The holding does not look behind the Georgia death penalty statutes, however, to determine any issue about the inherent caprice *vel non* of those laws. Rather, it reiterates the language of *Gregg* that the Georgia

Supreme Court must direct the discretion of juries in its interpretation of the meaning and applicability of the death penalty statutes. It was determined in *Godfrey* that the Georgia Supreme Court had failed in this duty as to the individual petitioner there; a failure of the statutory system was not found or implicated. *See Smith v. Balkcom,* 660 F.2d at 584–85.

*Gregg v. Georgia, Spenkelink v. Wainwright,* and *Smith v. Balkcom.* Similarly, the Court finds that the issue regarding an allegedly infirm system of appellate review of death cases is foreclosed by these decisions as well.

### B. The Witherspoon Issues

Petitioners Ross and Spencer challenge the exclusion for cause of jurors who expressed opposition to the death penalty under the holding of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). That case states that a defendant's sixth amendment right to an impartial jury is violated when the trial jury was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty, or expressed conscientious or religious scruples against its infliction. The challenge is on two fronts. The exclusion for cause of several jurors is directly challenged. Secondly, petitioners seek to expand the *Witherspoon* holding to proscribe as partial juries composed largely of those without conscientious or religious scruples against the death penalty. Petitioners cite their proffered evidence, scientific studies, which indicates that such juries are prosecution prone.

■■■ *Witherspoon* bans the exclusion for cause of jurors who voice general objections to the death penalty, or conscientious or religious scruples against its infliction. 391 U.S. at 522, 88 S.Ct. at 1776. This ban does not prevent a state from excluding for cause:

> . . . [T]hose who make unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n.21, 88 S.Ct. at 1776 n.21. The courts demand strict adherence to these guidelines; a juror may be properly excluded under *Witherspoon* only if his avowals show unequivocally that he is disqualified under at least one of the two tests. *Granviel v. Estelle,* 655 F.2d 673, 677–78 (5th Cir. 1981); *Burns v. Estelle,* 626 F.2d 396, 397–98 (5th Cir. 1980) (en banc). The Court is concerned here with the testimony of one prospective juror in the trial of Ross, and three in the trial of Spencer.

Venireman Barker was questioned by the judge in Ross' trial. The dialogue consisted of the following:

THE COURT: Let me ask you this, Mr. Barker. If you were selected as a juror in this case, would you be guided by the law as given you in Charge by the Court as to the alternate penalties that may be assessed, should the defendant be found guilty, and consider all of those alternatives?

MR. BARKER: I could not condemn anyone to death. I believe that God gives life and its a precious life and I don't have the right to take it.

THE COURT: The question was asked you earlier during the statutory voir dire questions, if you were conscientiously opposed to capital punishment.

MR. BARKER: Yes.

THE COURT: Would this opinion that you have as to capital punishment prevent you from assessing the death penalty regardless of what the evidence showed?

MR. BARKER: I could not pass judgment and condemn him to death, no, sir.

MR. COLE: We challenge the juror for cause.

THE COURT: Are you stating to the court that regardless of what the evidence is in this case, what the evidence may show, that you still would refuse to impose the death penalty?

MR. BARKER: Yes.

(Ross Trial Tr., p. 57–58). This colloquy very clearly shows that the venireman would automatically vote against imposition of the death penalty regardless of what the evidence might have shown at trial. There was no constitutional error in excusing this juror for cause. *See Burns v. Estelle,* 626 F.2d at 398.

■ Two veniremen at Spencer's trial made their opposition to the death penalty similarly unambiguous. Mr. Harden was questioned as follows:

Q. Yes sir. Now, let me ask the question again. Are you in any way opposed or are you conscientiously opposed to the infliction of the death penalty?

A. Do I oppose it?

Q. Yes sir.

A. I do.

Q. You're opposed to the death penalty?

A. I do.

Q. Are you—is your opposition to the death penalty such that you don't feel like you could vote to impose it under any circumstances?

A. Do I feel that I would not oppose it?

Q. That you would not vote to impose it, that you wouldn't bring a death verdict under any circumstances?

A. Oh, I wouldn't—I wouldn't vote that.

Q. Regardless of how the evidence turned out, you wouldn't vote the death penalty?

A. No, I wouldn't.

(Spencer Trial Tr., p. 577–78). Juror Martin testified:

Q. Are you opposed to capital punishment—conscientiously opposed to capital punishment?

A. Yes sir.

Q. Is your reservation about capital punishment such that you would not—it would keep you from making an impartial decision in this case as to the defendant's guilt?

A. (No response)

Q. You could decide this case whether or not the defendant's guilty . . .

A. If he was guilty.

Q. . . . regardless of what you believe in about capital punishment?

A. No sir.

Q. Your reservations about capital punishment are such that you could never vote to impose the death penalty, is that correct?

A. Yes sir.

(Spencer Trial Tr., p. 596). Both of these jurors expressed unambiguous opposition to the imposition of the death penalty, and their firm intention to vote against it regardless of what the evidence showed. They were properly excused under *Witherspoon.*

This same clear lack of ambiguity is not present in the statement of the third juror so excused in Spencer's trial. Mr. Kinnard testified:

Q. Are you conscientiously opposed to capital punishment?

A. Yes.

Q. Now, Mr. Kinnard, would your reservations about capital punishment prevent you from making an impartial decision as to the defendant's guilt in this case?

A. It's quite possible.

Q. Your reservations about capital punishment, then, are such that you would never vote to impose the death penalty, is that correct to say?

A. I've never faced it, but I believe that would be true.

Q. That you would not under any circumstances vote the death penalty?

A. I believe so.

Q. Are your reservations about capital punishment such that you would refuse to even consider its imposition in the case before you under any circumstances?

A. Yes.

(Spencer Trial Tr., p. 220–21). Mr. Kinnard's statement leaves no doubt about his opposition to the death penalty.

This opposition is not the test, however. The Court of Appeals for the Fifth Circuit has found a juror similarly opposed to the death penalty still to have been prematurely excused, not because her conscientious beliefs were in doubt, but because ambiguity remained as to how this would affect her deliberations as a juror. *Burns v. Estelle,* 626 F.2d 396 (5th Cir. 1980) (en banc); *see*

*also Granviel v. Estelle*, 655 F.2d 673 (5th Cir. 1981). In *Burns* the colloquy was as follows:

Q. [By the prosecutor] All right. Let me ask you this question, a sentence of life imprisonment or death is mandatory on conviction of a capital penalty case, you understand that?

A. Yes, sir, I understand it.

Q. All right. And this is a capital felony case.

A. I don't believe in it.

Q. Ma'am?

A. I do not believe in it.

Q. Let me go into it then. You told me just then that you did not believe in death?

A. That's right.

Q. All right. Then will the mandatory penalty of death or imprisonment for life affect your deliberation on any issue of fact, which what you just told me it will, in other words the mandatory penalty of death or imprisonment for life will affect the deliberations on any issue of fact in this case, is that correct?

A. That's right.

MR. GREEN: All right. Judge, we ask this juror be excused.

626 F.2d at 397 n.2. The court there held that these expressions, strong though they were, did not go far enough to warrant the juror's exclusion under the two-pronged test of *Witherspoon*.

■ Mr. Kinnard's expressions appear at first to be less strong than those of Mrs. Doss, the juror in *Burns* ; where she answered affirmatively to initial inquiries, Mr. Kinnard indicates "It's quite possible" and "I believe so." However, the record leaves no doubt that both jurors harbor strong beliefs in opposition to the death penalty. The crucial question asks how these beliefs will affect their deliberations. Mrs. Doss affirmed only that her beliefs would affect her deliberations, not that they would prevent her from performing her duties. Mr. Kinnard was asked a different question. The query put to him was whether his beliefs were such that he would refuse to

even consider the imposition of capital punishment under any circumstance. His answer was "yes." The Court finds no ambiguity in this reply, and accordingly rules the exclusion of Mr. Kinnard proper under *Witherspoon*.

■ The petitioners next assert that the exclusion for cause of jurors such as Mr. Kinnard results in a trial by a "death-qualified" and prosecution-prone jury in violation of the guarantee by the sixth and fourteenth amendments of an impartial panel. Examining the identical issue, the court in *Spenkelink* rejected the conclusion implicit in petitioner's proffered evidence, that a panel so constituted is necessarily a partial one. Assuming, *arguendo*, the truth of the allegation of prosecution-proneness, that court said:

That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant.

578 F.2d at 594. The record in *Spenkelink* revealed that, other than a willingness to impose the death sentence if the evidence required it, no juror not excluded for cause expressed any partiality to either side, nor, significantly, any reluctance to acquit. The record here reveals the same. Noting that the state also enjoys the right to impartiality, the court went on to say:

[I]mpartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution.

578 F.2d at 596. The court concluded:

The jury that emerges after excluding such veniremen, having been carefully examined to exclude also for cause those veniremen who are biased against the defendant, either as to guilt or as to punishment, is impartial. To call it prosecution-prone is to misunderstand the meaning of impartiality.

*Id.* This Court has found the exhaustive examination of the issue, 578 F.2d at 593–96, to be persuasive, and has excluded the petitioner's proffered evidence as a result. More importantly, the holding by the *Spenkelink* court is binding authority. *Accord, Smith v. Balkcom,* 660 F.2d at 575–585. The allegation of these petitioners must fail under these rulings.

C. *Infliction of the Death Penalty by Electrocution*

■ The next issue common to all three petitions is the contention that the means of imposition of the death sentence in Georgia is cruel and unusual within the meaning of the prohibition of the Eighth Amendment. Georgia law provides that those who receive the death penalty shall be executed by electrocution. Ga.Code Ann. § 27–2512. In support of this position they have made an offer to produce evidence showing that this method of execution is unnecessarily tortuous and painful, especially when compared to presently available alternatives such as lethal injection.

This issue was examined and rejected by the Court in *Spenkelink,* relying on the decision of the Supreme Court in *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). *Spenkelink,* 578 F.2d at 616. The holdings of the *Spenkelink* court, rejecting the contention identical to the one at bar, requires the same conclusion here. The allegation is without merit.

D. *Notice of Aggravating Circumstances*

■ The petitioners allege that they were not given timely notice of the specific aggravating circumstances that were used to justify the capital sentence each received under Georgia Code Annotated § 27–2534.1 because these aggravating circumstances were not alleged in their indictments. Briefly, there is no Georgia law, statutory or decisional, which requires the indictment to list the aggravating circumstances upon which a defendant accused of murder can be later sentenced to death. The crime these three petitioners were accused of was murder. The aggravation listed in section 27–2534.1 determines whether a murder, once proved, is the sort for which death may be exacted; the statutory aggravating circumstances are not elements of the crime. This allegation is without merit. *Spenkelink,* 578 F.2d at 609–10; *Blankenship v. State,* 247 Ga. 590, 594, 277 S.E.2d 505 (1981); *Bowden v. Zant,* 244 Ga. 260, 263–64, 260 S.E.2d 465 (1979), *cert. denied,* 444 U.S. 1103, 100 S.Ct. 1068, 62 L.Ed.2d 788 (1980); *Smith v. State,* 236 Ga. 12, 20, 222 S.E.2d 308 (1976), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976); *Eberheart v. State,* 232 Ga. 247, 253–54, 206 S.E.2d 12 (1974), *remanded for resentencing,* 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977).

E. *The Jury Challenges*

All three petitioners raise issues concerning the allegedly unconstitutional composition of grand or petit juries. These are treated as common issues because they are resolved by the same legal analysis.

■ This analysis begins with the Georgia law concerning challenges to grand and petit juries. The Georgia Code relating to habeas corpus petitions states, in pertinent part:

. . . Except for objections relating to the composition of grand or petit jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly, and intelligently. The right to object to the composition of the grand or travers jury will be deemed waived under this section, unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has otherwise become final.

Ga.Code Ann. § 50–127(1). This waiver will be imposed unless the challenges are

timely. A challenge to an array must be made when the array is put upon the defendant, Ga.Code Ann. §§ 59–802, 803; *Young v. State*, 232 Ga. 285, 206 S.E.2d 439 (1974); *Farley v. State*, 155 Ga.App. 188, 270 S.E.2d 361 (1980), and a challenge to a grand jury must be made even before indictment. *Durham v. State*, 239 Ga. 697, 238 S.E.2d 334, 338 (1977). *See Stewart v. Richetts*, 451 F.Supp. 911, 914 (M.D.Ga. 1978).

■ If the state has a valid rule of criminal procedure which requires the defendant to object to a grand or petit jury at a certain time, failure to make this objection may preclude consideration of the claim in federal court. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). Under these Supreme Court holdings, a petitioner must demonstrate cause for a procedural default and actual prejudice from the error before a federal court may grant relief under 28 U.S.C. § 2254. This Court's responsibility, then, must first be to determine whether a default has occurred. The record in these cases here makes it abundantly clear that such a default must be overcome by all three petitioners.

■ Billy Mitchell did not voice a challenge to his grand jury until his state habeas corpus proceeding. Under Georgia Code Annotated § 50–127(1), this constitutes a waiver. Additionally, he entered a plea of guilty to the charge of murder. This plea constitutes a permanent waiver of constitutional infirmities which precede the entry of the plea unless it is shown the plea was not voluntarily and intelligently entered. *Tollett v. Henderson*, 411 U.S. 258, 266–67, 93 S.Ct. 1602, 1607–08, 36 L.Ed.2d 235 (1973). This waiver may be overcome by showing he pleaded guilty on advice not "within the range of competence demanded of attorneys in criminal cases." *Id.* The Court's conclusion in a later section of this opinion that he was afforded effective assistance during this phase precludes Mitchell from escaping this consequence of his guilty plea.

Petitioner Ross did not raise the issue until his state habeas corpus hearing. Section 50–127(1) imposes a waiver on him as well.

James Spencer's challenge is subjected to lengthy and detailed examination by the Georgia Supreme Court, *Spencer v. Hopper*, 243 Ga. 532 at 533–37, 255 S.E.2d 1, after which that Court found that Spencer's challenge was not timely filed, was not supported by the presentation of evidence, was waived before the trial began and was not revived on appeal. 243 Ga. at 536–37, 255 S.E.2d 1. This is a finding of three independent procedural defaults: untimely filing of the challenge, waiver of the challenge by failure to support it with evidence and by a positive relinquishment of it by Spencer's counsel, and waiver by failure to argue the challenge on direct appeal. Only the second conclusion warrants discussion here; the first and third are well supported by the evidence and are binding on this Court.

■ Immediately prior to the beginning of trial, Spencer was asked by the prosecutor if he insisted upon his jury challenge and a motion for change of venue. Spencer's attorney, John Ruffin, replied that he was under the impression that the motions had been disposed of, and the trial judge agreed. The prosecutor then asked, "May I inquire as to whether or not the accused insists on them?". Speaking for his client, Mr. Ruffin replied, "Not while I'm under the impression that they have been disposed of." (Tr. p. 608) The Georgia courts have interpreted Mr. Ruffin's remark (and Spencer's silence after it) as an expression of satisfaction with the jury which included several blacks. 243 Ga. 536, 536 n.4, 255 S.E.2d 1. While Mr. Ruffin's rather cryptic statement might be read to imply a waiver, the statement seems to express, when taken at face value, the simple idea that counsel was not going to belabor a motion he felt had been ruled on. Mr. Ruffin's testimony before this Court reinforces this point. The Georgia Supreme Court examined two pages of transcript missing from this Court's copy, and concluded that, indeed,

the motions *had* been ruled on. 243 Ga. at 536 n.3, 255 S.E.2d 1. To insist on a motion which had already been overruled would be futile, and Mr. Ruffin's statement apparently reflects that logic. Given the ambiguity of Mr. Ruffin's remark, this Court, however, does not reject the Georgia court's conclusion of waiver. The Court instead finds that it is unnecessary to resolve the question one way or another. Lack of a waiver would not salvage Spencer's jury challenge. The facts remain that the challenge was filed late and was abandoned on appeal. These independent procedural defaults require the application to Spencer of the requirements imposed in *Francis v. Henderson, supra.*

All three petitioners must therefore demonstrate cause and actual prejudice resulting from the error they allege. The Court's determination that none of them can demonstrate sufficient cause precludes examination of any prejudice.

 On January 27, 1981, this Court held an evidentiary hearing to allow the petitioners to show, among other things, the cause and prejudice required by *Wainwright v. Sykes* and *Francis v. Henderson.* No evidence was introduced to show the cause of any of the various defaults involved. Relying on the record, counsel argued on behalf of Ross and Mitchell that trial counsel's inadvertence or ignorance is a sufficient showing of cause. *Tyler v. Phelps,* 622 F.2d 172, 177 (5th Cir. 1980) is cited in support of this proposition. This assertion must fail, even ignoring the fact that, at least for Ross, this inadvertence or ignorance was never demonstrated outside the assertions of his counsel. *Tyler v. Phelps* would support the proposition for which it is cited, except that the case has been reheard *en banc.* This strips the opinion of any precedential value. *U. S. v. Michael,* 645 F.2d 252, 254 n.2 (5th Cir. 1981) (*en banc*), *cert. denied,* —— U.S. ——, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981).

After rehearing, the Court declined to follow the panel holding that a trial counsel's ignorance or inadvertence is sufficient "cause" under *Wainwright v. Sykes. Tyler*

*v. Phelps,* 643 F.2d 1095, 1101 (5th Cir. 1981) (*en banc*). While the *en banc* opinion does not hold the opposite, a later case does. In *Washington v. Estelle,* 648 F.2d 276 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 402, 70 L.Ed.2d 216 (1980), the Court of Appeals squarely holds that an allegation of ineffective assistance of counsel does not alone suffice to demonstrate "cause" under *Sykes.* 648 F.2d at 278.

The logic behind this holding is clearly stated. Quoting an earlier holding, the *Washington* court said:

[P]etitioner has not demonstrated cause for his failing to make a timely challenge. His only allegation in this regard is that his trial attorney provided ineffective assistance of counsel in failing to so object. This assertion must be rejected, however, for, if accepted, it would effectively eliminate any requirement of showing cause at all. If a petitioner could not demonstrate any legitimate cause, he would only have to raise the spectre of ineffective assistance of counsel to get his challenge heard. This we refuse to sanction.

648 F.2d at 278, quoting *Lumpkin v. Ricketts,* 551 F.2d 680, 683 (5th Cir. 1977), *cert. denied* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316 (1977). This logic is even more compelling when applied to an inadvertent default which falls short of ineffective assistance. Without even the necessity of showing his counsel's assistance was not constitutionally sufficient, a petitioner could cure any default by merely showing his attorney overlooked a particular point, or forgot to file a particular motion, or simply neglected to pursue a particular strategy because he was too busy. The destructive impact of a holding sanctioning this ability is obvious. This Court accordingly reads *Washington* to repudiate mere inadvertence as well as mere ineffective assistance of counsel as sufficient "cause" to overcome a default under *Wainwright v. Sykes.*

 Supposing then that Ross had shown that his default was the result of inadvertence, his petition must still fail on this point. Similarly, Mitchell's attorney has testified that he actively considered a

jury challenge and elected not to pursue one because in his opinion the jury system in Worth County, which had been recently revised, was constitutionally sound, and that a challenge to the grand jury would have been futile and unnecessary. (Habeas Tr. pp. 18–19; deposition of Clarence Miller, pp. 51–52). His election was an informed decision of trial strategy, deliberately made. This is not "cause" either, and may, in fact, be characterized as a deliberate bypass of an available state remedy under *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). *See Tyler v. Phelps*, 643 F.2d at 1101. Additionally, Mitchell's jury challenge is defeated by the waiver effect of his guilty plea. *Tollett v. Henderson, supra.*

 Spencer has similarly made no showing of cause. His silence on the subject at the hearings before this Court requires reliance on the record for evidence of cause. The record offers no support for the petitioner in this regard. Spencer filed his challenges late. For cause he must rely on his right to represent himself and his ignorance of the law requiring timely challenges to juries. However, while he may have had the right to file *pro se* motions, he also had a court appointed attorney to use as a resource to advise him on the legal effect of these motions. That he declined to do so and effectuated a procedural default as a result is "inadvertence" in the sense discussed above. This Court will not regard it as sufficient cause. Additionally, the challenge, timely or not, was not pursued on appeal. In the absence of any proffered reason for this, the Court need not go so far as to label it a purposeful relinquishment of the issue, but certainly the petitioner's silence on the issue is, at the least, a failure to uphold the burden placed on him by *Wainwright v. Sykes.*

None of these petitioners have demonstrated cause sufficient under *Wainwright v. Sykes* to alleviate them of the procedural defaults incurred with regard to their jury challenges. An independent review of the evidence does not show that any of the three can do so. Such a showing is a prerequisite to this Court's ability to examine the issue formerly abandoned. Failing this showing, there is no need to review the issue of whether actual prejudice has inured to the petitioners. No relief can be granted to any of the three on this issue.

## III. THE INDIVIDUAL ISSUES

### A. *William "Billy" Mitchell*

This petitioner raises four remaining grounds which allegedly render his conviction unconstitutional. He asserts: (1) his court appointed attorney rendered ineffective assistance; 2) the insufficiency of justifications for capital punishment; 3) the imposition of the death penalty was inappropriate in his case; and 4) the improper admission into evidence at his sentencing hearing of coerced statements.

### 1) Ineffective Assistance of Counsel

Mitchell alleges he was denied his right to counsel guaranteed by the Sixth and Fourteenth Amendments by ineffective assistance of his court appointed counsel at both the guilt and the sentencing phases of his trial. He alleges his counsel, Clarence Miller, failed adequately to investigate the facts of the case, did not obtain and review petitioner's statements given to police, did not investigate or press legal defenses available to Mitchell, and did not present evidences or witnesses to show mitigating circumstances at Mitchell's sentencing hearing.

These allegations were the subject of a lengthy hearing in the Superior Court of Tattnall County, Georgia. Subsequent to that hearing, the Superior Court made detailed findings of fact:

Petitioner's trial attorney was appointed to represent Petitioner on August 12, 1974; the murder had been committed on August 11, 1974. (H.C.T. 11, 23). The attorney testified that the practice of criminal law comprised between one-fourth to one-third of his general practice. (H.C.T. 10). He had represented criminal defendants in over 100 cases, including 30 murder cases, in the seven years he had been a member of the Geor-

gia bar. (H.C.T. 22). He estimated that he met with Petitioner on four to five occasions for rather lengthy interviews. (H.C.T. 21). He personally participated in the lineup identification of Petitioner, including selecting the other participants, shortly after Petitioner's arrest. (H.C.T. 24). He interviewed the witnesses, particularly the officers involved in taking Petitioner's statement. (H.C.T. 25). He was able to see the real evidence held by the State, including the pistols used in the murder. (H.C.T. 26). All evidence was readily accessible to him. (H.C.T. 26).

This Court finds that Petitioner's trial attorney had ample time to prepare to defend his client, that he did in fact fully investigate the facts surrounding the murder, that he had lengthy discussions with his client on at least four occasions, that he made an effort to effect a plea bargain with the district attorney, that he fully advised his client of the alternative courses of action available, and that he adequately assisted Petitioner in order to allow him to make an informed decision to plead guilty.

Resp. Ex. 3, pp. 9–10. These findings are fairly supported by the record. They are, therefore, binding on this Court under 28 U.S.C. § 2254(d) unless Mitchell can "establish by convincing evidence that the factual determination by the state court was erroneous." 28 U.S.C. § 2254(d).

Mitchell has proffered no such evidence. He has filed depositions purporting to establish that Mr. Miller did not, as the state court found, actually interview all the possible witnesses in the case. The depositions do not, in fact, establish this fact, or even indicate it in a manner sufficient to warrant the substitution of a different version of facts four years after the first habeas corpus hearing and seven years after the crime.

In this circuit the constitutional standard for effective assistance of counsel is not errorless counsel or counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance. *Spivey v. Zant*, 661 F.2d 464, 477 (5th Cir. 1981). This Court must inquire into the actual performance of counsel in conducting the defense, and a determination whether reasonably effective assistance was rendered must be based on the totality of the circumstances and the entire record. *U. S. v. Gray*, 565 F.2d 881, 887 (5th Cir. 1978), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). A review of the record evidence, Miller's testimony at the Tattnall County hearing and his deposition, show, even independent of the superior court judge's conclusions, that Miller rendered Mitchell assistance well within the parameters of the constitution. Even assuming the truth of Mitchell's allegation that Miller did not interview all the witnesses (a conclusion which the record does not support), does not necessarily show ineffective assistance. Miller need only have investigated the case to the point where he was familiar with the facts and the state's case. He appears without doubt to have done at least this much. Mitchell is silent on why his counsel should have done more. He shows no defense which might have been established and no other way in which his case was prejudiced. Absent some showing of prejudice, this claim even if true, cannot stand. *See Davis v. Alabama*, 596 F.2d 1214, 1221–23 (5th Cir. 1979), *judgment vacated*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980).

This discussion concerns the guilt/innocence phase of Mitchell's trial. While the petition alleges ineffective assistance in the sentencing phase as well, the findings of the state court do not discuss the action of Miller during the sentencing hearing. It is for this Court, then, to make an independent finding regarding the assistance rendered during this last phase of Mitchell's conviction. This will be accomplished in a later order.

2) Justification for Capital Punishment

Mitchell alleges the theoretical justifications for capital punishment are groundless and irrational and that because the penalty

fails to serve any rational or legitimate social interests, the harshness of the sentence makes it excessive. Imposition of a capital sentence, thus, would violate the Eighth Amendment prohibition of cruel and unusual punishment. In support of this proposition, the petition alleges that public sentiment is "not so strong as to require or justify use of the death penalty," that executions do not have an identifiable deterrent effect, that executions induce violence, and that life sentences serve penalogical purposes better than death sentences.

As noted above, several hearings have been held for the purpose of determining what evidence it would be necessary or unnecessary to hear in order to resolve the legal questions raised. No mention of the issue is made in the state court findings of fact or in the Georgia Supreme Court opinions in the case, either on direct appeal or on appeal from the denial of habeas corpus relief.[12] No evidence was proffered in support of this allegation in this Court either. In fact, neither party even mentioned it.

■■■ This default could well be interpreted as an abandonment of the issue, but it is not necessary to so rule.

> [The Courts] may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

*Gregg v. Georgia*, 428 U.S. at 175, 96 S.Ct. at 2926 (Opinion of Stewart, Powell and Stevens, J.J.). Suffice it to say Mitchell has not carried this burden here.

■■■ The Court will opine further, however, that the issue has been legally foreclosed on several fronts. Noting that "[t]he instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law," 428 U.S. at 183, 96 S.Ct. at 2929, *citing Furman v.*

*Georgia*, 408 U.S. at 308, 92 S.Ct. at 2761 (Stewart, J.), the concurring justices cited above instruct that retribution is not a constitutionally forbidden purpose for exacting this punishment, and is not "inconsistent with our respect for the dignity of men." *Id. See also Roberts v. Louisiana*, 428 U.S. 325 at 337, 96 S.Ct. 3001 at 3007, 49 L.Ed.2d 974 (White, J., dissenting).

Both the propriety of retribution as a justification for the death penalty and the effectiveness of a deterrent effect are the subjects of an old and heated debate. The proper forum for this debate, however, is not properly in the courts of this country but in the chambers of the legislatures. As the Court noted in *Gregg*, "the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be death." 428 U.S. at 184, 96 S.Ct. at 2930 (footnote omitted). With regard to deterrence, Justice Stewart further opined in that case:

> The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.

428 U.S. at 186, 96 S.Ct. at 2931.

In short, this Court should be more than chary of substituting its own judgment for that of the Georgia legislature. It certainly cannot attempt this hubristic task in an evidentiary vacuum. Relief must be denied on this issue.

### 3) Imposition of the Death Penalty in Mitchell's Case

Mitchell alleges that the death penalty is excessive in his case in light of all the relevant mitigating factors relating to the offense and the petitioner. In support of this, Mitchell has made an offer of proof to

---

12. The issue was raised, however. See Respondent's Ex. 2, p. 2.

include evidence to show he had a good character, was a civic leader, that he was well educated, and lacked a criminal record.

■ The Georgia Supreme Court considered whether the sentence of death was disproportionate in its review on direct appeal as mandated by Georgia Code Annotated § 27–2537. *Mitchell v. State*, 234 Ga. 160, 214 S.E.2d 900. Of course, in its consideration that Court did not have benefit of any of petitioner's proffered evidence, as the defense rested at the sentencing hearing without the presentation of any evidence. This strategy is the subject of Mitchell's attack on the competence of his counsel, discussed above. This Court's determination of the question, however, must be made on the same record available to the Georgia Supreme Court.[13]

■ The Georgia Supreme Court made the findings of fact contained in its opinion, some of which have been recited in an earlier section of this order. With this knowledge of the crime, that court then examined Georgia precedent and made a factual determination that the death penalty was not excessive or disproportionate to the penalty imposed in cases involving similar crimes. *Mitchell v. State*, 234 Ga. at 163, 214 S.E.2d 900.

This conclusion is binding upon this Court unless it is shown to be deficient under 28 U.S.C. § 2254(d). The sixteen cases relied upon by the Georgia Supreme Court to make the determination are listed in an appendix to the opinion. These cases have been reviewed in this Court. It is the determination of this Court that the "evidence" of these cases fairly supports the conclusion of the Georgia Supreme Court

that the sentence of death is not disproportionate or excessive with regard to Mitchell's crime. No other impediment imposed by section 2254(d) is evident. This Court, then, must accept the conclusion of the Georgia Supreme Court, and by so doing must deny relief on this ground.

4) Admission of Statements, Illegal Arrest

Mitchell complains that two statements given to police at the time of his arrest were extracted from him unconstitutionally, and their admission into evidence invalidated his sentencing hearing. The coercion and duress he alleges were used to extract the statements are accompanied by allegations of an illegal arrest and insufficient warrant as well.

■ Significantly, Mitchell does not anywhere allege that his guilty plea was involuntary. The conclusion of the state courts that he was rendered competent assistance of counsel at the initial stages of his conviction, and the evidence which required that conclusion, will allow no other conclusion but that Mitchell entered his plea of guilty with a full informed knowledge of the nature and consequences of his act. By so doing, he waived any objection to non-jurisdictional constitutional deprivations which occurred prior to his plea. *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). He is thus foreclosed from raising these issues here.

Additionally, with regard to the statements, the state habeas court found that Mitchell's allegations that the statements were coerced were not credible. This credi-

---

**13.** The logic of this proposition is obvious. While the additional evidence petitioner wishes had been presented at sentencing affects his claim of ineffective counsel, which could require at least partial relief, it is not relevant to the determination of whether the Georgia Supreme Court fulfilled its statutory duty imposed by section 27–2537. That duty cannot be performed except upon the record before that Court, and this Court's review must, accordingly, be so restricted as well.

The Court will note, however, that consideration of evidence now before it in examining this

issue is not necessarily beneficial to Mitchell. While he would have introduced evidence of good character, etc., there is also counterveiling evidence before this Court which only reinforces the conclusion of the state courts. Specifically, the court notes that according to Clarence Miller, Mitchell displayed the unrepentant rebellious personality of a self-labeled "black sheep," who claimed responsibility for numerous other robberies and killings aside from the one he accomplished and the three he attempted in the case at bar.

bility determination is asserted to be incorrect by the petitioner. However, none of the evidence he has proffered has or could convincingly demonstrate this error sufficiently to dispell the presumption of correctness imposed by section 2254(d).

Relief must be denied on this ground as well.

### B. *Willie X. Ross*

Ross has four allegations remaining. They are: 1) that the denial of his motion for a change of venue denied him a fair trial; 2) the use of perjured testimony denied him a fair trial; 3) the death penalty is disproportionate in this case; and 4) the insufficiency of justification for the death penalty.

### 1) Change of Venue

■ A criminal defendant certainly has a right to be tried by an impartial jury. An impartial and indifferent jury, however, need not have been totally ignorant of the facts and issues involved:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Once a juror has assured that he can set aside any preconceptions about the case, it becomes the petitioner's burden to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Id.*

■ A petitioner must show that the setting of the trial was inherently prejudicial, or that the jury selection process of which he complains permits an inference of actual prejudice in order to prove a violation of his right to an impartial jury which

rises to a constitutional level. *Murphy v. Florida,* 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). He must demonstrate an actual and identifiable prejudice on the part of jury members attributable to publicity, *Mayola v. Alabama,* 623 F.2d 992, 996 (5th Cir. 1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981), or that community prejudice actually infected the jury box. *Bronstein v. Wainwright,* 646 F.2d 1048, 1051 (5th Cir. 1981).

This Court's independent review of the record, *Bronstein v. Wainwright,* 646 F.2d at 1051, requires the conclusion that Ross has not carried this burden. The evidence before the Court does not support the allegation that the atmosphere at the time of the trial in any way prevented Mr. Ross from the measured and impartial judicial proceeding to which he had a right.

■ The *voir dire* revealed that almost every juror had heard or read accounts of the case; there is no question that the case received much publicity. This is not in itself unusual for a venire from a small, largely rural community where violent events such as the one in which Ross participated are not at all usual. However, of the sixty odd jurors who were interviewed, relatively few[14] answered that they had a preconceived opinion about the case based upon the pretrial publicity, and of these only three affirmed that they could not set this opinion aside and judge the case on the evidence presented in court alone. These jurors were excused for cause. *Voir Dire* Tr. pp. 23, 55, 63. Also, it is significant that most of the jurors were asked whether they felt any pressure from the community to return a conviction or whether a verdict of not guilty would cause repercussions upon the jurors' business or community life. Only one indicated in the affirmative; he was excused for cause. *Voir Dire* Tr. pp. 115–16. These facts do not indicate the trial was conducted in an atmosphere which affected the petitioner's trial in any significant way. Ross' proffered evidence, deposi-

---

**14.** The Court counts six.

tions of local media representatives, and attached exhibits of newspaper stories, does not alter this conclusion. It demonstrates at most that extensive coverage of the case occurred, not that an atmosphere of hysteria or prejudice against Ross existed, and certainly not that any community "atmosphere" infected the trial or jury. Further, the evidence makes no showing of actual prejudice to Ross caused by the publicity. Given these facts, the Court finds that the trial court was well within its discretion in denying petitioner's motion for a change of venue.

The petitioner cannot prevail on this issue.

### 2) Use of Perjured Testimony

■ Ross claims the prosecution suborned the perjured testimony of his brother by the combined use of threats, promises and rewards. Ross' brother, Theodore Ross, testified against him at trial to the effect Ross had remarked to Theodore that he had shot a policeman during the shootout. Theodore recanted this testimony at the state habeas hearing, asserting he had been promised a light sentence and sexual relations with his wife in jail in return for the perjured testimony against his brother.

This evidence was presented for consideration to the judge of the Superior Court of Tattnall County, Georgia, at Ross' habeas corpus hearing. That court rejected Theodore's version as not credible. (Habeas order, p. 9). The credibility determination made by Judge Caswell appears reliable, and since Ross has not provided this Court with any indication of the reverse, 28 U.S.C. § 2254(d) requires this Court to accept that determination.

Relief must be denied on this issue.

### 3) Excessiveness of Death Sentence

■ Ross alleges the execution of his death sentence would inflict an excessive penalty in his case in consideration of all the relevant factors relating to the offense and the petitioner. In support of this he alleges, essentially in mitigation of his crime, that he has no significant criminal record, he is a high school graduate and has a good character, that others involved received lesser sentences, that it was not clear that Ross had actually shot the victim, and that officer Meredith provoked his own death by shooting at Ross.

This evidence is not relevant to this Court's duty. Ross had the opportunity to present this at the sentencing phase of his trial. He elected not to do so. Trial Tr., p. C-15. He has not alleged, either in state court or here, that his counsel was ineffective in this election. This Court's duty, then, is not to determine directly whether the death sentence is excessive with regard to Ross, it is rather to determine whether the Georgia Supreme Court fulfilled the statutory duty assigned by section 27–2537 in such a way as to make the presumption of correctness imposed by section 2254(d) binding. On direct appeal, of course, the Georgia Supreme Court determined the sentence was not excessive. (See the similar discussion with regard to Mitchell above.)

Petitioner's discussion on the applicability of section 2254(d) has not been extensive. Little evidence has, in fact, been offered in support of the mitigating circumstances alleged above, and no argument on how it applies under section 2254(d). The Court can surmise, however, that the argument would be that either condition number 3 or 8 is invoked, *viz.* that the evidence would show that the material facts have not been adequately developed in the state courts, or that the record does not fairly support the determination of the Supreme Court. None of the other six apply.

Absent a claim of ineffective assistance of counsel, Ross cannot now claim the material facts were not adequately developed because the evidence he wants this Court to consider was not presented at the sentencing phase of his trial; the obvious interpretation of this trial strategy is that Ross and his counsel were satisfied that the material facts *were* adequately developed, and that they wished the Georgia Supreme Court to consider the record as it was.

■ It is this record, then, which this Court must consider to determine, under section 2254(d)(8), if the finding of fact made by the Georgia Supreme Court, that the death penalty as imposed on Ross was not excessive, is fairly supported by the record. This Court's determination, based upon the record and the cases cited by the Georgia Supreme Court in its appendix to the opinion, *Ross v. State*, 233 Ga. 361 at 369, 211 S.E.2d 356, is that the record fairly supports that court's conclusion.

### 4) Justification for the Death Penalty

Ross raises the allegation that there is not sociological or penalogical justification for the death penalty. It is the same issue treated above for petitioner Mitchell. That treatment applies here. No relief can be granted on this issue.

### C. *James Lee Spencer*

Spencer raises two additional issues. Both relate to instructions given to the jury, and both are alleged to have denied him his right to be proven guilty beyond a reasonable doubt as to each element of the crime. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In particular, he objects to instructions which he alleges shifted the burden of proof to him in a hearing on a special plea of insanity, and in the final instructions to the jury at trial.

### 1) The Special Plea

At the end of Spencer's special plea of insanity, the trial judge gave the following instruction:

Now this is, in effect, a civil action which you must decide, and the burden of proof is upon James Lee Spencer to prove his case by what is known as a preponderance of the evidence.

Special Plea Tr., p. 38. Spencer alleges this language violated his rights under *In re Winship, supra*, and *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

■ His reliance upon these cases is misplaced. While he correctly notes that a defendant has a right protected by the constitution to be tried only when he is competent to understand the proceeding and assist in his defense, *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980), *Winship* and *Sandstrom* do not require the extrapolation of this right that the petitioner requests. These cases only require the state to shoulder the entire burden of proof beyond a reasonable doubt of "every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1072. The purpose of Spencer's "insanity" hearing was not to determine his state of mind at the time of the crime; it was to determine his competence to stand trial. Spencer claimed to have amnesia at the time of trial. Spencer's state of mind at trial is not an element of any crime with which he was charged, nor probative of any fact necessary to prove or defend against any of these crimes.

The instruction given was a correct statement of Georgia law, *Wallace v. The State*, 248 Ga. 255, 282 S.E.2d 325 (1981), which does not offend the Constitution. *Cf. Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (Requirement that defendant prove affirmative defense to murder of "extreme emotional disturbance" does not unconstitutionally shift burden of proof when actual elements of crime charged not affected).

### 2) The Presumption of Murder

Spencer challenges as unconstitutional two charges given to his jury during the guilt/innocence phase of his trial. The jury was charged about reconciliation of testimony:

I further charge you, members of the jury, that the law directs that it is your duty where it can be done to so reconcile conflicting evidence, if there be such evidence indicated, as to make all the witnesses speak the truth, so that perjury will be imputed to none of them. But if the evidence in the case is of such irreconcilable conflict that this cannot be done, you will accept that evidence most reasonable and credible to you.

Trial Tr., p. 799. And the jury was charged on presumptions: [15]

> I charge you that when the state's evidence shows the commission of a homicide by the accused by the use of a deadly weapon, the law presumes murder.

Trial Tr., p. 806.

 Spencer alleges that the first instruction lessened the burden of the state to prove every element of the offense beyond a reasonable doubt by informing the jury that, if at all possible, they could ignore reasonable doubt that might develop because of conflicts in evidence. This argument has no merit. The instruction merely informs the jurors to construe inconsistent evidence against an implication of perjury if possible. It cannot be interpreted to direct or control a juror's entertainment of a reasonable doubt; it expressly directs that irreconcilable conflicts must be resolved according to what is "reasonable and credible" to each juror. The charge does not affect the burden of proof.

 The second charge does. *Sandstrom v. Montana* involved a jury charge which could reasonably be interpreted as either a conclusive presumption, an irrebuttable direction by the Court to find an element once certain facts are proved, or as a burden-shifting instruction, one which directs a certain finding unless rebutted by the defendant. 442 U.S. at 517, 99 S.Ct. at 2455. *Sandstrom* found both to be in violation of the precept expressed in *Winship.* While Spencer's jury, unlike David Sandstrom's, was charged that all presumptions may be rebutted, Trial Tr., p. 797, that charge occurred at a different place in the charge than the instruction that the law presumes murder upon proof of a homicide committed with a deadly weapon. This charge is of precisely the sort proscribed in *Sandstrom.* As in *Sandstrom*, this defect is not removed by detailed and careful instruction elsewhere that the state must prove each element beyond a reasonable

doubt, that the defendant is presumed innocent until proven guilty, etc. 442 U.S. at 518 n.7, 99 S.Ct. at 2456 n.7.

 The investigation here must turn to whether this error was harmless. Spencer cites *Hammontree v. Phelps*, 605 F.2d 1371, 1380 (5th Cir. 1979) for the proposition that such an error can never be harmless. While one of the headnotes does state this, the case itself does not. In fact, the *Sandstrom* court left this question open. 442 U.S. at 526–27, 99 S.Ct. at 2460. *See Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). This Court opines that the error here may be treated as harmless. *See, e.g., Milton v. Wainwright*, 407 U.S. 371, 372–73, 92 S.Ct. 2174, 2175, 33 L.Ed.2d 1 (1972) (Constitutional error held harmless in light of overwhelming evidence of guilt); *Mason v. Balkcom*, 669 F.2d 222, 225 (5th Cir. 1982) (Court recognized that a burden-shifting charge might be harmless given appropriate circumstances such as overwhelming evidence of guilt.).

The defective charge instructs on what is necessary to prove the crime of murder. The jury was also charged, according to Georgia law, that:

> A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances show an abandoned and malignant heart. A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice.

Trial Tr., p. 804; *see* Ga.Code Ann. § 26–1101. Before constitutional error can be held harmless it must be shown to be harm-

**15.** In a brief filed at the direction of the Court May 14, 1981, Spencer attempts to include other charges on presumptions in his challenge here. Since these were not presented to the

courts of Georgia or included in the actual petition to which the state is basing its response, this Court will ignore the additions as surplusage.

less beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Given the overwhelming evidence in this case, it is inconceivable that a jury would not have convicted James Lee Spencer of murder under Georgia law even if the faulty instructions were omitted. The error was harmless beyond a reasonable doubt.

This Court must, therefore, deny relief to the petitioner on this ground also.

### ORDER

The allegations of constitutional deprivations have been considered and found to be without merit. It is, therefore, hereby ORDERED that:

1) The petition for the writ of habeas corpus of Willie X. Ross be DENIED;

2) The petition for the writ of habeas corpus of James Lee Spencer be DENIED;

3) The petition for the writ of habeas corpus of William "Billy" Mitchell be DENIED as to those issues considered herein;

4) The suits of Willie X. Ross and James Lee Spencer shall be DISMISSED and final judgment entered for the respondent in each case;

5) The suit of William "Billy" Mitchell shall not be dismissed pending further order of this court. This order will follow a hearing on the remaining issue of ineffective assistance of counsel at the sentencing phase of his trial to be held in this Court at 9:00 o'clock A.M. on the 19th day of May, 1982, at the United States Courthouse, Savannah, Georgia; and

6) The stays of execution entered in these cases shall not be lifted except by future order of this Court.